**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILILNOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CASCADES COMPUTER INNOVATION, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 11 C 4574 |
| | ) | |
| MOTOROLA MOBILITY HOLDINGS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ---------------------------------------------------------------- | ) | |
| CASCADES COMPUTER INNOVATION, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 11 C 7223 |
| | ) | |
| SONY ERICSSON MOBILE COMMUNICATIONS (USA) INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ---------------------------------------------------------------- | ) | |
| CASCADES COMPUTER INNOVATION, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 11 C 7249 |
| | ) | |
| PANTECH WIRELESS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ---------------------------------------------------------------- | ) | |
| CASCADES COMPUTER INNOVATION, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 11 C 7252 |
| | ) | |
| SHARP ELECTRONICS CORP., | ) | |
| | ) | |
| Defendant. | ) | |

```
-----------------------------------------------------------------------)
CASCADES COMPUTER INNOVATION, LLC,           )
                                             )
                          Plaintiff,         )
                                             )
            vs.                              )   Case No. 11 C 7264
                                             )
DELL INC.,                                   )
                                             )
                          Defendant.         )
```

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In separate lawsuits, Cascades Computer Innovation, LLC has sued a number of defendants alleging infringement of U.S. Patent No. 7,065,750. Two of the cases (Case Nos. 11 C 7252 and 11 C 7264) are assigned to the undersigned judge. The others (Case Nos. 11 C 4574, 11 C 7223, and 11 C 7229) were transferred to the undersigned judge pursuant to Northern District of Illinois Internal Operating Procedure 13 for purposes of claim construction and, via a subsequent order, for consideration of parallel motions to dismiss filed in each of the cases. This decision concerns the motions to dismiss.

Cascades does not own the '750 patent. Rather, it alleges that it has an exclusive license under the patent and the exclusive right to sue for its past, present, and future infringement. Defendants contend that others have rights under the '750 patent – or, at least, that Cascades has failed to show otherwise – and that Cascades lacks standing to sue for infringement of the patent on its own.

### Discussion

A suit for patent infringement may be brought by a patentee, a term defined by

statute to include the party to whom the patent was issued and successors in title. 35 U.S.C. §§ 281 & 100(d). A party to whom a patent has been assigned likewise has the right to sue for infringement on its own, without joining the patent owner. See *Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891); *AsymmetRx, Inc. v. Biocare Medical, LLC*, 582 F.3d 1314, 1318-19 (Fed. Cir. 2009). A mere licensee of a patent, however, generally may not sue without joining the patent owner, either voluntarily or involuntarily. See *Independent Wireless Telegraph Co. v. Radio Corp. of Am.*, 269 U.S. 459, 468, 473-74 (1926); *AsymmetRx*, 582 F.3d at 1319.

"[T]he critical determination regarding a party's ability to sue in its own name is whether an agreement transferring patent rights to that party is, in effect, an assignment or a mere license." *AsymmetRx*, 582 F.3d at 1319. This "[does] not depend on the name applied to it, but on the intention of the parties as revealed by the record." *Id.* at 1318 (citing *Waterman*, 138 U.S. at 255). To determine whether an assignment of patent rights was made, a court must "examine whether the agreement transferred all substantial rights to the patent[ ] and whether the surrounding circumstances indicated an intent to do so." *Id.* at 1319 (internal quotation marks omitted).

For purposes of determining a licensee's right to sue, there are three categories of licensees, based on the amount of exclusionary control the licensee has: "those that can sue in their own name alone; those that can sue as long as the patent owner is joined in the suit; and those that cannot even participate as a party to an infringement suit." *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339 (Fed. Cir. 2007). Those who can sue in their own name alone are assignees and exclusive licensees to whom "all substantial rights to the patent" have been transferred. *Id.* at 1340. Exclusive licensees

3

who do not hold all substantial rights must join the patent holder in order to sue, to avoid the possibility that the accused infringer could later be sued separately by the patent holder. *Id.* Licensees who lack exclusionary rights – such as those who are authorized to make, use, and sell the patented product but have no right to prevent others from doing so – cannot sue for infringement. *Id.* at 1341.

In January 2011, Cascades entered into an "exclusive license agreement" with Elbrus International Ltd., a Cayman Islands company with its principal place of business in Russia, and Elbrus Svarog L.P., a Cayman Islands limited partnership with its principal place of business in that same country. The agreement recited that Elbrus International was the exclusive owner of the '750 patent and other patents and that it was granting Cascades "worldwide exclusive license rights" in the patents in order to "commercialize" them. Dell Mot. to Dismiss, Ex. 1 ¶ A. The agreement further stated that Elbrus International and Elbrus Svarog had been parties to a previous "exclusive license" dated January 2009 but had entered into an agreement terminating that exclusive license. *Id.* ¶ C. The Elbrus / Cascades agreement stated that Elbrus Svarog had joined as a party "to ensure that all rights to license and enforce the Patents are conveyed to [Cascades] hereunder." *Id.*

Paragraph 1.1 of the Elbrus / Cascades agreement stated that the Elbrus entities granted to Cascades "the worldwide, exclusive right and license under the Patents to exclude others from making, having made, using, importing, offering to sell or selling products, methods or services covered by the Patents, including the exclusive right to grant sublicenses . . ., to sue for and collect past, present and future damages and to seek and obtain injunctive or any other relief for infringement of the Patents and to

4

otherwise enforce and/or commercialize the Patents." *Id.* ¶ 1.1. The same paragraph stated that the grant of the exclusive right and license as described "shall be exclusive, even as to Licensor, and, except for the rights granted under the Existing Licenses (defined below), shall be exclusive with respect to any and all persons or entities throughout the world." *Id.* The agreement conferred upon Cascades the exclusive right to license and make other agreements concerning the patents, "provided, however, [Cascades] acknowledges and agrees that Licensor has granted certain licenses to third parties which are identified in Schedule 2 hereto (the 'Existing Licenses') and that the license rights granted to Licensee hereunder are qualified by the rights granted to the licensees under the Existing Licenses." Cascades further acknowledged and agreed that the patents "may be included in the Agreement dated December 30, 2000, between Elbrus International Limited and ZAO MCST, set forth in Schedule 2 hereof." *Id.* Finally, paragraph 1.1 stated that "Licensor expressly retains no rights to enforce or license the Patents, including without limitation, the right to sue for infringement of the Patents, prior to any termination of this Agreement, and specifically grants Licensee all such rights prior to any termination." *Id.*

The Elbrus / Cascades agreement repeated in paragraph 1.3 that "Licensor expressly retains no rights to sue, to seek and to obtain injunctive or other relief for infringement of the Patents, and no other rights or licenses under the Patents are granted or implied." *Id.* ¶ 1.3. The Elbrus entities also expressly gave up the right to assign, license, or otherwise convey any rights under the patents or to create any liens or encumbrances on them. *Id.* ¶ 1.4. In another paragraph of the agreement, the Elbrus entities represented and warranted that "except for the Existing Licenses, neither

5

Licensor nor any Inventor has assigned, licensed, granted covenants not to sue, transferred or otherwise conveyed to any other person or entity any of its or his rights, title, claims, interest or privileges with respect to the Patents." *Id.* ¶ 3.1.4.

As noted earlier, paragraph 1.1 of the Elbrus / Cascades agreement referenced certain existing licenses, listed in Schedule 2 of the agreement. Schedule 2, entitled "Existing License Agreements with Respect to Patents," identified two existing agreements concerning the patents: a "License Agreement dated December 30, 2000, entered into by and between Elbrus International Limited and ZAO MCST, as amended from time to time," and a "Patent License Agreement dated May 19, 2004, as amended from time to time" between ZAO Elbrus MCST, a Russian joint stock company, OOO Novosibirsky Centr Informatsionnykh Tekhnologii "UNIPRO," a Russian limited liability company, ZAO UniPro Systemy, a Russian joint stock company, Elbrus Services Limited, a Cayman Islands company, and Elbrus International, on the one hand, and Intel Corporation on the other. *id.*, Sched. 2.

The December 2000 Elbrus International / ZAO MCST license agreement was a "non-exclusive, non-transferable, perpetual license" granted to ZAO MCST to reproduce and use certain hardware to develop a microprocessor and to reproduce, use, and modify certain licensed software to develop "the Elbrus Microprocessor Software." Dell Mot. to Dismiss, Ex. 2 ¶ 2.1. The agreement recited that Elbrus International owned and retained ownership of all intellectual property rights in the licensed technology. *Id.* ¶ 2.6.

The agreement described in Schedule 2 of the Elbrus / Cascades agreement as the "Patent License Agreement dated May 19, 2004, as amended from time to time"

6

between Elbrus International and certain other related entities and Intel Corporation is the primary bone of contention in the present motions to dismiss. No executed copy of a May 19, 2004 patent license agreement has been produced or, apparently, located by any party. The only executed patent license agreement among those parties that has been located is an agreement dated August 6, 2004. The August 6, 2004 agreement is entitled "Patent License Agreement Between Bear and Eagle USA Corporation." The parties to this agreement are Elbrus International and the related entities referenced earlier – referred to collectively as "Bear," presumably because of their Russian origin – and Intel Corporation, referred to in the agreement as "Eagle" due to its origin in the United States. *See* Dell Mot. to Dismiss, Ex. 5. In the August 6, 2004 agreement, the "Bear" entities granted to Intel "a non-exclusive, non-transferrable, fully-paid, world-wide license, without the right to sublicense" regarding various patents, including the '750 patent, to make, use, sell, offer to sell, import and otherwise dispose of Intel products and to have such products made by others for supply to Intel. *Id.* ¶ 3.1. The August 6, 2004 agreement also contained the following provision:

> Entire Agreement. This Agreement embodies the entire understanding of the Parties with respect to the subject matter hereof, and merges all prior discussions between them, and neither of the Parties shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. No oral explanation or oral information by either Party shall alter the meaning or interpretation of this Agreement.

*Id.* ¶ 7.6.

Both the December 2000 license granted to ZAO MCST and the August 6, 2004 license granted to Intel were non-exclusive licenses that conferred no exclusionary rights. No defendant contends that the ZAO MCST license impacts Cascades' right to

7

sue in any way. In addition, at oral argument on the present motions to dismiss, defendants expressly conceded that if the August 6, 2004 Intel license were the only other agreement regarding the '750 patent, then Cascades would have the right to sue for infringement on its own, without joining the patent holder. *See* April 22, 2013 Tr. at 10-11. That is, in fact, the law. If a party is or amounts to an assignee of a patent, it may sue in its own name, without joining the patent holder, despite the existence of other non-exclusive licenses. "[A]n exclusive licensee does not lack constitutional standing to assert its rights under the licensed patent merely because its license is subject not only to rights in existence at the time of the license but also to future licenses that may be granted only to parties other than the accused." *WiAV Solutions, Inc. v. Motorola, Inc.*, 631 F.3d 1257, 1267 (Fed. Cir. 2010).

The most important consideration in determining whether an exclusive licensee has the right to sue in its own name without joining the patent holder Is the nature and scope of the exclusive licensee's right to bring suit, together with the nature and scope of any right to sue retained by the licensor. *See, e.g., Albert E. Mann Fdn. for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1361 (Fed. Cir. 2010); *AsymmetRx*, 582 F.3d at 1320-21. In this case, Cascades' license from the Elbrus entities conferred upon it the sole right to sue, and the Elbrus entities – the patent holders – correspondingly gave up their right to sue. *See* Dell Mot. to Dismiss, Ex. 1 ¶¶ 1.1 & 1.3. Other factors considered include the licensee's right to sublicense; the nature of any license provisions concerning the reversion of rights to the licensor following breaches of the license agreement; any right on the part of the licensor to receive a portion of any recovery in an infringement suit by the licensee; the duration of the license rights; any

obligation of the licensor to continue paying patent maintenance fees; and the nature of any limits on the licensee's right to assign its interests in the patent. *Alfred E. Mann Fdn.*, 604 F.3d at 1360-61. In this case, these factors point in favor of a finding that all substantial rights in the '750 patent were transferred to Cascades: Cascades was given the exclusive right to grant sublicenses, with the Elbrus entities giving up any sublicensing rights, *see* Dell Mot. to Dismiss, Ex. 1 ¶ 1.1; the license extends until the expiration of the patents, and expiration does not affect Cascades' right to recover damages for prior infringement, *see id.* ¶ 6.1; Cascades is given the duty of maintaining the patent and is required to pay or promptly reimburse the Elbrus entities for any patent maintenance fees, *see id.* ¶ 4.1; and Cascades may assign its rights to an affiliated company that agrees to be bound by the terms of the license, *see id.* ¶ 7.1.

It appears that the Elbrus entities are entitled to a portion of the recovery in patent infringement litigation brought by Cascades, *see id.* ¶¶ 6.5 & 6.6, but this factor does not outweigh the others, particularly the grant to Cascades of exclusive rights to enforce the patent against third parties and the corresponding relinquishment of enforcement rights by the Elbrus entities. The fact that the Elbrus / Cascades agreement prohibits Cascades from settling patent infringement litigation in a way that would extinguish the patents or require Elbrus to pay money likewise does not outweigh the other factors that establish that the agreement conveyed to Cascades all substantial rights to the patent. *See id.* ¶ 5.3. The agreement makes it clear that whether and when to sue is entirely up to Cascades, as is the right to direct any litigation and negotiate or determine settlement or other disposition; the Elbrus entities do not have a veto power or even a voice. *See id.* ¶¶ 5.2 & 5.3. In addition, the same provision cited

9

by defendants says that approval by Elbrus of any extinguishment of the patent pursuant to a settlement "shall not be unreasonably withheld, condition or denied." *Id.* ¶ 5.3.[1]

In sum, the Court concludes that the agreement between the Elbrus entities and Cascades is sufficient to confer all substantial rights to the '750 patent and thus amounts to an assignment, enabling Cascades to sue in its own name without adding Elbrus International, the patent owner.

Defendants' argument for dismissal is based less on the proposition that the August 2004 agreement conferred insufficient rights upon Cascades than on defendants' contention that there are, or may be, other agreements that limit the rights that Cascades hold with respect to the '750 patent. Defendants' arguments lack merit. First, they point to a patent license agreement between Intel and U.S.-based Elbrus entities other than the two (Elbrus International and Elbrus Svarog) that granted the license to Cascades. *See* Defs.' Joint Suppl. Brief (dkt. no. 101) at 3 & Ex. 1. Defendants argue that the fact that Intel entered into such an agreement calls into question whether Cascades has a license from all of those who had ownership interests in the patent. This is a red herring. In the January 2011 Elbrus / Cascades exclusive license agreement, Elbrus International represented and warranted that it was the sole owner of the patents and held all rights to the patents other than the previously-

---

[1] In their supplemental brief – but not sooner – defendants seem to say that Elbrus International retained the right to make and use devices under the patent (they falsely cite page 7 of their opening brief as having made this assertion earlier). That does not appear to the Court to be accurate. The Elbrus / Cascades agreement confers on Cascades the exclusive right to exclude others from making or using products (etc.) under the patents and says that this "shall be exclusive, *even as to Licensor*," except for the two previously described non-exclusive licenses to Intel and ZAO MCST. Defs.' Mot. to Dismiss, Ex. 1 ¶ 1.1 (emphasis added).

described non-exclusive licenses, and both Elbrus International and Elbrus Svarog represented and warranted that they had not assigned or transferred their rights under the patents.  *See* Dell Mot. to Dismiss, Ex. 1 ¶¶ A, 3.1.1 & 3.1.4.[2]  There is no evidence that undercuts these representations.  The fact that Intel took a belt-and-suspenders approach in acquiring its license from the Elbrus entities, which is essentially what Intel's representative stated during his deposition, *see* Defs.' Joint Suppl. Brief, Ex. 2 (Smith dep.) at 35, does not amount to evidence that calls into question the accuracy of the representations and warranties contained in the Elbrus / Cascades exclusive license.  Defendants' supplemental brief, in citing the deposition testimony by Intel's representative (who had negotiated the agreements), rather glaringly omits that representative's express *denial* that Intel had concerns that the U.S.-based Elbrus entities held patent rights.  *See id.*

Second, defendants point to the absence of the referenced May 2004 Elbrus / Intel agreement.  They contend that the recent deposition of the Intel representative, taken at the Court's insistence following oral argument on the motions to dismiss, "confirm[ed] the existence of the May 2004 agreement that has not yet been produced," Defs.' Joint Suppl. Brief at 5, and they suggest that this missing agreement might impair Cascades' rights in some way.  The Court disagrees.  First of all, Intel's representative *did not* "confirm the existence" of a May 2004 Elbrus / Intel license agreement.  Rather, he testified that the agreements that Intel had produced pursuant to subpoena – which did not include an executed May 2004 license agreement – were all of the agreements

---

[2] The Elbrus / Cascades license reflects that Elbrus Svarog, though not the owner of the patents, joined as a party out of an abundance of caution due to its previous receipt of an exclusive license that had been terminated in January 2009.  *See* Dell Mot. to Dismiss, Ex. 1 ¶¶ C & 3.1.6.

11

that Intel has relating to licenses from Elbrus entities. *See* Defs.' Joint Suppl. Brief, Ex. 2 (Smith dep.) at 11. Having considered all of the evidence, the best and most reasonable explanation for Elbrus's reference in Schedule 2 of the Cascades exclusive license to a "Patent License Agreement dated May 19, 2004, as amended from time to time" is either that the August 6, 2004 agreement that has been produced is the "amended" version of an earlier agreement, or that the May 19 reference was simply a scrivener's error, in other words, a mistake. There is, in the Court's view, no reasonable possibility supported by any evidence that any earlier agreement between Elbrus and Intel impairs or limits Cascades' rights in any way. As previously noted, the August 6, 2004 Elbrus / Intel agreement contains an express integration clause stating that it "embodies the entire understanding of the Parties with respect to the subject matter hereof." Dell Mot. to Dismiss, Ex. 5 ¶ 7.6. The "subject matter" covered by the integration clause unquestionably includes rights to the referenced patents, including the '750 patents. Thus if there actually was a May 19, 2004 agreement that deals with rights to that patent, it was effectively extinguished by the August 6, 2004 agreement, given that agreement's integration clause.

In this regard, the Court notes that during his deposition, Intel's representative made reference to a "master agreement" between the Elbrus entities and Intel that likely is dated May 19, 2004. *See* Defs.' Joint Suppl. Brief, Ex. 2 (Smith dep.) at 30. It is conceivable that this is the May 19 agreement referenced in the Elbrus / Cascades exclusive license. Intel did not produce the so-called master agreement, apparently having taken the position that it was outside the scope of whatever subpoena was served, or perhaps because it was subject to a confidentiality understanding with the

Elbrus entities. *Cf. id.* at 56-57, 59-60. However, Intel's representative (the in-house attorney who helped negotiated the agreements with the Elbrus entities, *see id.* at 6-7), affirmed that the two executed agreements that Intel *did* produce, namely its agreements with the Russian and Cayman Islands Elbrus-related entities and with the U.S. Elbrus entities, were the only agreements relating to any Elbrus patents. *See id.* at 56-57, 59. Because there is no reasonable basis to believe that the master agreement has any bearing on Intel's (and thus Cascades') rights concerning the '750 patent, the absence of this agreement does not alter the Court's analysis. The Court also notes – though this is not necessary to the present decision – that if the master agreement might be available to Cascades via subpoena, it was and is equally available to defendants. For this reason, and without any indication that the master agreement has any bearing on the issues before the Court, defendants cannot cite the absence of that agreement as an "aha" factor that favors their position.

In sum, the Court concludes that Cascades has met its burden of showing that the intent and effect of the January 2011 Elbrus / Cascades exclusive license was to confer on Cascades all substantial rights to the '750 patent. Cascades therefore has the right to sue in its own name and need not add the patent holder as a party.

## Conclusion

For the reasons stated above, the Court denies defendants' motions to dismiss.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 5, 2013

13